# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No. 21-00571-als11 |
| | ) | |
| **CYCLE FORCE GROUP, LLC** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Honorable Anita L. Shodeen |
| | ) | |
| 2105 SE 5th St. | ) | **DEBTOR'S MOTION FOR ORDERS (I)(A)** |
| Ames, IA 50010 | ) | **APPROVING BIDDING PROCEDURES; (B)** |
| | ) | **SCHEDULING THE TIME, DATE, AND** |
| | ) | **FORM OF NOTICE FOR THE AUCTION** |
| EIN:  26-2671865 | ) | **AND SALE HEARING; AND (C)** |
| | ) | **APPROVING BREAK-UP FEE; AND (II)(A)** |
| | ) | **APPROVING THE SALE FREE AND** |
| | ) | **CLEAR OF LIENS, CLAIMS, INTERESTS,** |
| | ) | **& ENCUMBRANCES; AND (B)** |
| | ) | **AUTHORIZING ASSUMPTION AND** |
| | ) | **ASSIGNMENT OR REJECTION OF** |
| | ) | **LEASES AND EXECUTORY CONTRACTS** |
| | ) | |
| | ) | No Hearing Set. |

**COMES NOW**, Cycle Force Group, LLC (the "Debtor" or "CFG"), Debtor and debtor in possession herein, by and through its duly-employed general reorganization counsel, Jeffrey D. Goetz, Esq. and Krystal R. Mikkilineni, Esq. of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., and respectfully files this Motion for Orders (I)(A) Approving Bidding Procedures; (B) Scheduling the Time, Date, and Form of Notice for the Auction and Sale Hearing; and (C) Approving Break-Up Fee; and (II)(A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (B) Authorizing Assumption and Assignment or Rejection of Leases and Executory Contracts, and would show this Honorable Court as follows:

1.      On April 22, 2021 (the "Petition Date"), CFG filed its voluntary petition under
chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (Docket No. 1).

2.      The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      No trustee or examiner has been appointed in this case.

4.      On May 7, 2021, the Office of the United States Trustee (the "UST") filed a Notice
of Appointment of Committee of Unsecured Creditors (the "Committee") (Docket No. 77).

### JURISDICTION

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and
1334. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core
proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for relief sought herein
include Bankruptcy Code sections 105(a), 363, 365 and Rules 2002, 6004, 6006 and 9006 of the
Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### BACKGROUND

6.      Since the Petition Date, the Debtor has strategized and continued negotiating
with interested parties and creditors to formulate a consensual and feasible plan of
reorganization.  However, in light of the ongoing global shipping crisis and its potential future
impact on CFG, the feasibility of CFG's current ability to reorganize under Chapter 11, and after
thorough consultation with its counsel and advisers, CFG has made the business decision to
pursue an orderly sale of substantially all of its assets as a going concern to maximize value for
the estate and its creditors.

7.      By this Motion, CFG seeks authority to solicit bids and sell substantially all of its
assets (the "Assets") at auction (the "Auction") without a stalking horse bidder at this time.

8.      On September 16, 2021, the Debtor filed an application to employ Ravinia

Capital, LLC ("Ravinia") as its investment banker (the "Investment Banker") (Docket No. 171).

(the "Employment Application") to market the Assets and run an auction process to determine

the highest and best bid for the Assets.  The Employment Application was approved by the Court

on September 29, 2021(Docket No. 186).

### RELIEF REQUESTED

9.      As stated above, CFG intends to sell the Assets and believes an orderly sale of the

Assets after a structured marketing period is the best way to maximize the value of the Assets for

the benefit of creditors, the estate, and other parties in interest.

10.     By this Motion, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code

and Bankruptcy Rules 2002, 6004, 6006, and 9006, the Debtor seeks entry of:

(a) The "Bidding Procedures Order", substantially in the form attached hereto
    as "Exhibit A":
    i.   Authorizing and approving the "Bidding Procedures," substantially
         in the form attached as "Exhibit 1" to the Bidding Procedures
         Order;
    ii.  Authorizing the Break-Up Fee in the event of a Stalking Horse
         Bidder;
    iii. Authorizing and approving the procedures for the assumption and
         assignment of executory contracts and unexpired leases and the
         determination of cure costs (the "Assumption and Assignment
         Procedures");
    iv.  Scheduling a hearing with respect to approval of the sale of the
         Acquired Assets (the "Sale Hearing") and notices related thereto
         within forty-five (45) days of entry of the Bidding Procedures
         Order (subject to the Court's availability); and
    v.   Approving various deadlines in connection with the foregoing.

(b) The "Sale Order," which shall be filed with the Court at least fourteen (14)
    days prior to the Sale Hearing and shall be in form and substance
    reasonably acceptable to the Debtor and the Successful Bidder,
    authorizing and approving:
    i.   The sale of the Assets of CFG free and clear of any liens, claims,
         interests, and encumbrances (the "Acquired Assets") to the
         Successful Bidder (the "Sale Order");

      ii.  The assumption and assignment of certain executory contracts and
unexpired leases of the Debtor in connection therewith; and

     iii.  Granting related relief.

## I.    <u>Need for Timely Sale Process</u>

11.    Despite the best efforts of the Debtor and its professionals, the Debtor has been unable to achieve its Chapter 11 goals five months into the case.  The Debtor's original strategy at the outset of the case was to confirm an "earn-out" plan of reorganization. Ultimately, however, the Debtor was unable to establish a plan of reorganization in light of the ongoing global shipping crisis and its future impact. Due to the COVID-19 pandemic and shipping crisis and the impacts of these on its business, the Debtor was left with no clear path forward toward a true "reorganization" plan.

12.    During the five months of the case, the Debtor has been authorized to use cash collateral through a stipulation and consent order.  The Debtor has not sought or obtained debtor-in-possession financing to operate its business. Without a clear and expeditious path forward, and with no other outside source of financing readily apparent, the Debtor believes the most expeditious and value-maximizing path to emergence is one that would result in the least amount of administrative expense and deterioration in the value of its business, thus leading to the conclusion that it is the correct time to pursue a sale of substantially all its assets pursuant to section 363 of the Bankruptcy Code on the terms proposed herein.

## II. <u>Marketing Efforts</u>

13.    There has been no marketing of the assets of CFG prior to the date of filing the application to employ the Investment Banker, primarily because, until recently, the Debtor was pursuing a standalone earn-out type of reorganization plan.  CFG has engaged in good-faith discussions with both Great Western Bank and the Committee as to a path forward, culminating

now with the Sale Motion before the Court.  There is, however, a robust marketing process contemplated by the Bidding Procedures, to be led by the Investment Banker, Ravinia, pursuant to separate motion filed on September 16, 2021 (Docket No. 171) and approved by the Court on September 29, 2021 (Docket No. 186).  The marketing process will garner interest in the Debtor's Assets and facilitate the Debtor receiving the highest and best offer for its Assets.

14.     In order to do the most efficient job possible in marketing CFG's Assets, creating a competitive auction environment, and testing the marketplace to ensure the Debtor and the estate are realizing maximum value for the sale of the Debtor's Assets, the Debtor has sought authority to engage Ravinia as its Investment Banker pursuant to an employment application approved by this Court on September 29, 2021.  The Investment Banker will work with management to prepare an executive summary of the Assets and its investment highlights to be distributed to potential buyers, both strategic and financial, who will execute non-disclosure agreements. Further, the Investment Banker plans to populate a virtual data room (the "VDR") to facilitate interested parties' due diligence exercises.  The Investment Banker will also work with interested parties to supplement diligence investigations and facility tours, as necessary.

**III.    Bidding Procedures**

15.     The Bidding Procedures are designed to maximize value for the Debtor's estate and will enable the Debtor to review, analyze, and compare all bids received to determine which bid is the highest and best.  The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing Bidding Procedures.  The Debtor submits that the Bidding Procedures afford it the opportunity to

pursue a sale process that will maximize the value of its estate.

16.     The Bidding Procedures will provide detailed instructions, requirements and notice to all interested parties regarding access to diligence materials, the assets to be sold, the bidding process, key dates for potential preliminary bidders, the bid submission process, determination and announcement of baseline bids, and conduct of the Auction and bidding terms.

17.     The Bidding Procedures and Form APA also provide that upon termination of any Stalking Horse Bidder's APA, if applicable, the Bid Deposit submitted by such Stalking Horse Bidder will be returned to the Stalking Horse Bidder and the Debtor will pay the Stalking Horse Bidder any third-party costs incurred by the Stalking Horse Bidder up to $50,000.00 (the "Termination Expenses").  The Form APA also provides that upon consummation of an alternative transaction that is not the Stalking Horse Bidder's sale transaction, the Debtor will pay the Stalking Horse Bidder a break-up fee in an amount equal to $50,000.00, plus the Termination Expenses (collectively, the "Break-up Fee").  The Break-up Fee of up to $100,000.00 would be payable within five (5) business days of the Closing Date of the Successful Bidder, and until paid will be allowed as an administrative claim pursuant to Bankruptcy Code section 501(b)(1)(A).

**IV.     <u>Assumption and Assignment of Executory Contracts and Unexpired Leases</u>**

18.     To facilitate the Sale, the Debtor seeks authority to assume and assign to the Successful Bidder the Assumed Contracts in accordance with the following proposed Assumption and Assignment Procedures:

(a)     Within five (5) business days after the entry of the Bidding Procedures Order (the "<u>Assumption Notice Deadline</u>"), the Debtor shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on counsel to the Committee and each counterparty (each, a "<u>Counterparty</u>," and collectively, the "<u>Counterparties</u>") to an Assumed Executory Contract a Cure Notice.

(b)     The Cure Notice shall include, without limitation, the cure amount (each, a "Cure Cost"), if any, that the Debtor (after consultation with the Stalking Horse Bidder, if any) believes is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Executory Contracts and shall further include the Contract Objection Deadline.  If a Counterparty objects to the Cure Cost, the Counterparty must file with the Bankruptcy Court and serve on the Contract Objection Notice Parties a written objection (a "Contract Objection").

(c)     Any Contract Objection shall:  (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure; (iii) be filed with the clerk of the Bankruptcy Court, 300 U.S. Courthouse Annex, 110 East Court Avenue, Suite 300, Des Moines, Iowa 50309, together with proof of service, by the Contract Objection Deadline; (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Contract Objection Notice Parties (as defined below); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

(d)     The "Contract Objection Notice Parties" are as follows: (A) general reorganization counsel to the Debtor, attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradsahawlaw.com);; (B) counsel to the Committee: attention A.J. Webb (awebb@fbtlaw.com) and Robert Gainer (rgainer@cutlerfirm.com); and (C) counsel to Great Western Bank, attention Jeff Courter (jwc@nyemaster.com).

(e)     If, after the Assumption Notice Deadline, additional executory contracts or unexpired leases of the Debtor are determined to be Assumed Executory Contracts, as soon as practicable thereafter, the Debtor shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on counsel to the Committee and the Counterparties a Cure Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter.  In the event that the Stalking Horse Bidder, if any, and the relevant Counterparty cannot resolve any such Contract Objection, then the Stalking Horse Bidder shall promptly notice a hearing before the Bankruptcy Court to resolve such Contract Objection.

(f)     As soon as practicable thereafter and in no event later than one (1) business day after the date of the Auction, the Debtor shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been

consented to and where e-mail addresses are known), on the Counterparties a notice identifying the Successful Bidder, and the Counterparties shall file any Contract Objections <u>solely</u> on the basis of adequate assurance of future performance not later than two (2) hours prior to the commencement of the Sale Hearing.

(g)     At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of its assumption and assignment to the Successful Bidder of those Assumed Contracts that have been selected by the Successful Bidder to be assumed and assigned (collectively, the "<u>Selected Assumed Contracts</u>").  The Debtor and its estate reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(h)     If no Contract Objection is timely received with respect to a Selected Assumed Contract:  (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtor and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (ii) the Cure Cost for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtor and its estate or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(i)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "<u>Cure Dispute</u>"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that, if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtor and assigned to the Successful Bidder provided that the cure amount the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtor pending the Bankruptcy Court's adjudication of the Cure Dispute or the consensual resolution of the Cure Dispute by the Successful Bidder, on the one hand, and the objecting Counterparty, on the other hand.

(a) If no Contract Objection is timely received, the Debtor shall be authorized to assume and assign such Assumed Contracts to the Successful Bidder without further notice to creditors or other parties in interest and without the need for further order of the Bankruptcy Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

19.    The Cure Cost fixed by the Bankruptcy Court with respect to any Selected Assumed Contract shall be paid by the Successful Bidder directly to the counterparty to such contracts as promptly as practicable after approval of the assumption and assignment.  Further, the Successful Bidder shall provide adequate assurance of future performance under the Selected Assumed Contracts, as same is required by the Bankruptcy Court.  In either event, the order approving assumption and assignment shall provide that upon payment of the applicable Cure Cost, such counterparty shall not have any remaining claim against the Debtor or the Estate related to any default under any such Selected Assumed Contract.

## V.    The Proposed Transaction Is a Sound Exercise of Business Judgment and in the Best Interests of the Estate

20.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a Debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *See also* Bankruptcy Rule 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction").  This section generally permits a debtor to sell property of the estate outside of the ordinary course of its business where the proposed sale is a sound exercise of the debtor's business judgment and when such sale is proposed in good faith. *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 210 (S.D. Ohio 2008) ("Under the law of this [Sixth] Circuit, the Court may approve a sale of all of a debtor's assets under § 363(b) 'when a sound business purpose dictates such action.'") (quoting *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986)).

21.    Bankruptcy Code section 363 governs the Debtor's ability to sell property of the estate outside of the ordinary course of business. Although this section does not set forth a standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose. *See In re Lionel Corp.*, 722 F.2d at 1070-71; *Chrysler Group LLC v. South Holland Dodge, Inc.*, 862 F. Supp. 2d 661, 668 (E.D. Michigan 2012); *In re Dewey & LeBoeuf LLP*, No. 12–12321 (MG), 2012 WL 5386276, at *5 (Bankr. S.D. N.Y. Nov. 1, 2012); *In re Nicole Energy Services, Inc.*, 385 B.R. at 230. The burden of establishing a rational business justification lies with the debtor. *Nicole Energy*, 385 B.R. at 230 (citing *Lionel*, 722 F.2d at 1070-71). However, once the debtor makes such a showing, a presumption will attach that the decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the company. *See*, *e.g.*, *In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 900 (8th Cir. 2007).

22.    In the instant case, the proposed sale of the Assets constitutes a sound exercise of the Debtor's business judgment and has been proposed in good faith. First, an expeditious sale of the Assets will aid in minimizing the administrative expenses of the Debtor's estate, resulting in greater distribution to creditors.  Second, such sale as a going concern will ensure business operations and customer relationships will not be interrupted and thus enterprise value preserved. Finally, the sale represents the best opportunity for the Debtor to realize the value of the Assets on a going-concern basis, considering the factors in this case.  Testimony from Nyle Nims, president of CFG, will be elicited to prove the Debtor has good business reason and that CFG is exercising its business judgment. The Debtor's business judgment is validated because of the unforeseen pandemic-related issues, including significant import/export issues, causing challenges in the future and the Debtor to not be able to operate with profit going forward.

Furthermore, an absence of any other feasible path forward in the meantime does nothing other than cause the estate to incur additional administrative expenses while profits are being lost.

23.    The Debtor believes this Motion and the transactions contemplated thereby are in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this chapter 11 case. An orderly sale of the Assets is essential. The proceeds of the sale, to the extent sold as a going concern, will be greater than if the same Assets are sold in a piecemeal liquidation because the Debtor's ongoing business will not be interrupted, and ongoing vendor and consignment relationships can be maintained. The sale will also aid in minimizing the administrative expenses of Debtor's estate as the time and uncertainty of pursuing a plan process at this time, with no plan sponsor or feasible financing in sufficient amounts to cover expenses, will be more expensive to the estate and will create a less certain outcome. Finally, an orderly sale process will benefit the estate in that due to the issues that have arisen from unanticipated pandemic and import/export related issues, the Debtor will soon not be able to operate without profit. Therefore, the Debtor believes this Motion and the transactions contemplated thereby are in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this chapter 11 case.

24.    The Debtor submits that the factors described above and to be established by the Debtor's witnesses and exhibits at the Bidding Procedures and sale hearings will support an expeditious sale of the Assets and are consistent with the traditional rationale for authorizing a sale outside of a chapter 11 plan. *See also In re Boston Generating, LLC,* 440 B.R. 302, 321 (S.D.N.Y. 2010); *Lionel*, 722 F.2d at 1070.

## VI.    <u>Sale Free and Clear of Liens</u>

25.      Bankruptcy Code section 363(f) authorizes a Debtor to use, sell or lease property of the estate outside of the ordinary course of business, free and clear of any interest in such property. The Bidding Procedures provide for the sale of the Assets free and clear of all interests, liens, claims and encumbrances, including existing or asserted rights of first refusal, contractual restrictions on transferability or other similar protective rights. Any such interests, liens, claims and encumbrance would attach to the proceeds of the sale of the Assets (the "Sale Proceeds") ultimately attributable to the property against or in which such interest, lien, claim or encumbrances is asserted.

26.      Under Bankruptcy Code section 363(f)(2), a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the assets consent.  The Debtor is providing proper notice of this Motion to the United States Trustee, senior and other secured creditors, the Official Committee of Unsecured Creditors, counter-parties to executory contracts and unexpired leases, appropriate governmental authorities, and all other parties who have filed requests for special notice, thereby giving them the opportunity to object to this Motion. Provided no secured creditors object to this Motion, section 363(f)(2) will be satisfied. *See, e.g.*, *In re Motors Liquidation Co.*, 430 B.R. 65, 72) (in a chapter 11 case, noting that "secured lenders" approved a transaction under section 363(b) of the Bankruptcy Code and related transactions).

27.      Under Bankruptcy Code section 363(f)(4), a sale free and clear of all interests, liens, claims and encumbrances is permissible if the interest of any entity is in *bona fide* dispute. Under Bankruptcy Code section 363(f)(5), a sale free and clear of all interests, liens, claims and encumbrances is permissible if any party asserting an interest in the assets could be compelled to

accept money satisfaction of such interest in a legal or equitable proceeding. Any sale proposed

by the Debtor will satisfy both elements.

**VII.     The Sale of Substantially All of CFG's Assets Does Not Establish Any *Sub Rosa* Plan of Reorganization**

28.     A sale of assets may not be approved where such sale, rather than merely

changing the composition of the Debtor's assets, either restructures the right of creditors or

predetermines the rights of creditors under any future plan of reorganization. *See In re Braniff*

*Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Iridium Operating LLC*, 478 F.3d 452,

465-66 (2nd Cir. 2007); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir.

1986).

29.     In *Braniff*, the Fifth Circuit held that an agreement between the Debtor and its

creditors established a *sub rosa* plan of reorganization because, among other things, the

agreement:

> (i)     required that any future plan of reorganization allocate certain assets only to employees, shareholders or unsecured creditors of the Debtor;
> (ii)     required the secured creditors to vote a portion of their deficiency claim in favor of any future plan of reorganization approved by a majority of the unsecured creditors' committee; and
> (iii)     provided for the release of claims by all parties against the Debtors, its secured creditors and its officers and directors.

700 F.2d at 939-40.

30.     Unlike *Braniff*, the transactions contemplated by the Bidding Procedures will not

restructure the rights of the Debtor's creditors or predetermine the rights of such creditors under

any future plan of reorganization.

31.     Furthermore, the Debtor has articulated sound business justifications for selling

the Assets now, rather than as part of a plan. A Bankruptcy Code section 363 sale motion should

be approved if it is based on good business reasoning. *In re Lionel Corp.*, 722 F.2d at 1070; *In re*

*Equity Mgmt. Sys.*, 149 B.R. 120 (Bankr. S.D. Iowa 1993) (Court considered some of the

following factors: whether all parties in interest received reasonable notice; whether the purchase

price is fair and reasonable; whether there is a sound business reason for the sale; and whether

the proposed sale unfairly benefits insiders or proprietary purchasers, or unfairly favors a creditor

or class). Here, all such factors have been met.

32.      The value of the Assets will be tested in the marketplace via the auction and

bidding process mandated by the Bidding Procedures. The likelihood that a plan of

reorganization will be confirmed very quickly is doubtful and the future value of these Assets are

subject to being diminished if the case does not progress promptly with a sale process. The

Debtor needs a plan to emerge from chapter 11 and believes this sale process is the correct path

because there is no other plan that is feasible before the Court at the moment or likely to be

forthcoming.  This is an exercise of the Debtor's business judgment, which is the correct legal

standard to apply.

**VIII.**    **The Bidding Procedures Are Intended to Enhance Competitive Bidding**

33.      Applying Bankruptcy Code section 363, courts accord debtors substantial

deference in formulating procedures for selling assets. *See*, *e.g.*, *In re Boston Generating, LLC*,

440 B.R. 302, 329-330 (S.D. N.Y. 2010) (noting that the requirements for section 363 sales are

reviewed according to the deferential "business judgment" standard); *In re Adelphia Commc'ns*

*Corp.*, No. 02–41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003)

(applying the "business judgment" standard presumption of validity and noting that courts are

"loath to interfere with corporate decisions absent showings of bad faith, self-interest, or gross

negligence"). Indeed, courts recognize that "procedures intended to enhance competitive bidding

are consistent with the goal of maximizing the value received by the estate and are appropriate in

the context of bankruptcy sales." *In re Dura Auto. Sys., Inc.*, No. 06–11202, 2007 WL 7728109, at \*90 (Bankr. Del. Aug. 15, 2007).

34.     Here, the Bidding Procedures are supported by ample business justification, as provided herein and as will be established by the Debtor's witnesses and exhibits at the Bidding Procedures Hearing, and are reasonable and appropriate under the circumstances of this case. The proposed Bidding Procedures are designed to foster an open, competitive and fair sale process, while maximizing the value the estate hopes to obtain for the Assets.  The Bidding Procedures proposed herein substantially conform with bidding procedures approved by this Court within the past several years. *See Foods, Inc. dba Dahl's Foods*, No. 14-02689-11 (Bankr. S.D. Iowa); *Newton Mfg. Co.*, No. 15-01128-11 (Bankr. S.D. Iowa); *Wellman Dynamics Corp.*, No. 16-01825-als11 (Bankr. S.D. Iowa); *Sivyer Steel Corp.*, No. 18-00507-als11 (Bankr S.D. Iowa).  Accordingly, Debtor requests the Court approve the Bidding Procedures as fair and reasonable under the circumstances and authorize and direct the Debtor to proceed in accordance with them.

**IX.     The Potential Break-Up Fee Should be Approved**

35.     "It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." 3 COLLIER ON BANKRUPTCY § 363.03 [7] (15th rev. ed. 2002). Bankruptcy courts have identified at least two instances in which bidding incentives and protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *AgriProcessors, Inc. v. Iowa*

*Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*) 290 B.R. 90 (8th Cir. BAP

2003) (*Tama I*) (quoting *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

*Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (*O'Brien*). Second, if the availability of the

break-up fee and expense reimbursement were to induce a bidder to research the value of the

debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may

have provided a benefit to the estate by increasing the likelihood that the price at which the

debtor is sold will reflect its true worth. *Id.*; *see also In re Reliant Energy Channel View LP*, 594

F.3d 200, 206-08 (3d Cir. 2010).

36.    Further in *Wintz Companies*, the United States Bankruptcy Appellate Panel

of the Eighth Circuit held that when considering break-up fees, "the test is whether the

bankruptcy court, in its discretion, properly determines that the proposed fee, and the transaction

as a whole, make economic sense and are in the best interest of the bankruptcy estate and its

creditors." *In re Wintz Companies*, 230 B.R. 840, 846–47 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d

807 (8th Cir. 2000); *see also In re SpecialtyChem Prods. Corp.*, 372 B.R. 434, 440 (E.D.Wis.

2007) (Break-up fees are allowed when it "(1) arises from transaction with debtor-in-possession;

and (2) is beneficial to debtor-in-possession in operation of its business").

37.    The Eighth Circuit in *Reagan* also allowed for a $50,000 break-up fee when

it considered situations in which break-up fees are useful during a sale. *In re Reagan*, 403 B.R.

614, 619 (B.A.P. 8th Cir. 2009), aff'd, 374 F. App'x 683 (8th Cir. 2010).  In *Reagan*, the Court

stated, "[s]talking horse bids may generate interest in the assets and create a sense of confidence

in the value of the assets among prospective buyers who might assume that a willing buyer has

conducted due diligence. In the event that the stalking horse bidder is outbid, courts often

approve break-up fees to compensate the stalking horse for the 'cost' of showing its hand before

the auction, conducting due diligence and otherwise facilitating the creation of a market. *Id.* (citations omitted).

38.     In *Tama* I, the United Stated Bankruptcy Appellate Court in the Eighth Circuit used the *O'Brien* analysis from the Third Circuit Court of Appeals. *Tama I., * 290 B.R. at 96. The Court analyzed three established tests used to determine whether break-up fees are permitted: (1) the business judgment test; (2) the best interests of the estate test; and (3) the administrative claim test. *Id.* at 97. The Court in *Tama I* agreed with the Third Circuit's rationale that there is no justification for applying a break-up fee any different than an application for administrative expenses. *Id.* Therefore, in *Tama I*, the Bankruptcy Appellate Court for the Eighth Circuit reviewed the following nine factors set forth by the Third Circuit in *O'Brien* as relevant in deciding whether to award a break-up fee:

> (a)     the presence of self-dealing or manipulation in negotiating the break-up fee;
> (b)     the reasonableness of the break-up fee relative to the purchase price;
> (c)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
> (d)     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
> (e)     the correlation of the fee to a maximum of value of the debtor's estate;
> (f)     the support of the principal secured creditors and creditors' committees for the break-up fee;
> (g)     the benefits safeguard to the debtor's estate; and
> (h)     the substantial adverse impact of the break-up fee on unsecured creditors where such creditors oppose the break-up fee.

*See id.; see also O'Brien*, 181 F.3d at 536.

39.     The Break-up Fee falls squarely within the *O'Brien* factors. Further, the Break-up Fee is reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction.  It's anticipated the Purchase Price will be between $1.5 million

and $3.5 million.  As such, the median Purchase Price in such range is $2.5 million, equating to a

Break-up Fee of 4% of the Purchase Price.  Such Break-Up Fee is an amount similar to break-up

fees or expense reimbursements approved in other similar Chapter 11 cases. *See, e.g.*, *In re:*

*Otter Tail Ag Enters., LLC*., 2011 WL 231274 (Bankr.D.Minn.) (court approved $1 million or

1.59% of the stated purchase price); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr.

E.D. Mo. 2004) ("a break-up fee in the amount of $250,000.00 is allowed as part of the Purchase

and Sale Agreement); *In re ContinentalAFA Dispensing Co.*, 416 B.R. 661, 663 (Bankr. E.D.

Mo. 2009) (approving a breakup fee of 3.6% of the purchase price); *In re Foods, Inc*., No. 14-

02689-11, (Bankr.S.D. Iowa Dec. 03, 2014) (order approving break up-fee of $315,000 as

reasonable); *In re Things Remembered, Inc.,* Case No. 19-10234 (KJC) (Bankr. D. Del.)

(approving breakup fee of $425,000 or 2.4% of the purchase price and expense reimbursement

up to $350,000); *In re Bertucci's Holdings, Inc.,* Case No. 18-10894 (MFW) (Bankr. D. Del.)

(approving break-up of $750,000 or 4.4% of the cash portion of the purchase price and expense

reimbursement up to $245,000); *In re The Weinstein Co. Holdings LLC*, Case No. 18-10601

(MFW) (Bankr. D. Del.) (approving break-up fee of 3% of cash purchase price or $9.3 million

and expense reimbursement of up to 1.5% of the cash purchase price ($4.650 million), with right

to seek an amount up to 2% of the cash purchase price ($6.2 million) if the sale hearing is

delayed); *In re Brookstone Holdings Corp.,* Case No. 18-11780 (BLS) (Bankr. D. Del.)

(approving break-up fee of $900,000 or 1.4% of the cash purchase price and expense

reimbursement of up to $300,000).

      40.    Break-up fees usually range from one to four percent of the purchase price,

and are a fair and reasonable percentage of the proposed purchase price. *In re Tama Beef*

*Packing, Inc*., 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005) (*Tama II*). In *Tama II*, the Court

distinguished between break-up fees and simple administrative expenses by stating "Break-up

fees often surface, i.e., in conjunction with a "stalking horse's" unsuccessful bid. Depending on

the circumstances and the terms of the transaction, an unsuccessful stalking horse bidder may

seek reimbursement of its actual expenses or it may seek a break-up fee which is designed to

compensate the unsuccessful bidder for the risk and costs incurred in advancing the competitive

bidding process." *Id.*; *see also In re President Casinos, Inc*., 314 B.R. 786, 789 (Bankr. E.D. Mo.

2004) ("A break-up fee that is greater than the actual cost and expenses of the prospective

purchaser should constitute a fair and reasonable percentage of the proposed purchase price, and

should be reasonably related to the risk, effort, and expenses of the prospective purchaser.").

Here, the Break-up Fee is a fair and reasonable percentage of the proposed purchase price, and is

reasonably related to the proposed purchaser's risks, efforts, and expenses. *See Tama I*., 290

B.R. at 98-99. The presence of the Break-up Fee confers a benefit on this bankruptcy estate.

41.     Finally, the Break-up Fee does not hamper any other party's ability to offer a

higher or better bid for the Assets. Given the size of the Break-up Fee relative to the anticipated

total amount of consideration provided for the Assets, and relative to the "overbid" requirements

set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other

prospective bidders' interest in the Assets. *See In re Wintz Companies,* 230 B.R. at 847; *In re

President Casinos, Inc.,* 314 B.R. at 786*; Tama I*., 290 B.R. at 96.

42.     Furthermore, because the timely sale of the Assets is required and the auction

process is the most beneficial means to the Debtor's estate of maximizing the value of the

Acquired Assets, the Break-up Fee constitutes actual and necessary costs and expenses of

preserving the Debtor's estate. In addition, because a Stalking Horse Bidder APA, if any, will

create a floor for any additional bids, the Stalking Horse Bidder will have provided significant value to the Debtor's estate. The Debtor submits that the Break-up Fee is appropriate.

## X.    The Assumption and Assignment Procedures Should be Approved

43.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods., Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp*.), 4 F.3d 1095, 1099 (2d Cir. 1993).

44.    In connection with the sale transaction, the Debtor will assume and assign the Assumed Contracts (*i.e.*, the executory contracts or unexpired leases included in the Successful Bidder's APA).  In the Sale Transaction, the Debtor's assumption of the Assumed Contracts will be contingent upon payment of Cure Costs and effective only upon the Closing.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtor will therefore be relieved from any liability for any breach of any Assumed Contract after an assignment to the Successful Bidder.  As such, the assumption of the Assumed Contracts constitutes an exercise of the Debtor's sound business judgment.

45.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtor proposes to file with the Court,

and serve on each non-Debtor party to an Assumed Contract, a Cure Notice indicating the Debtor's

calculation of the Cure Costs for each such contract.  Non-Debtor parties to the Assumed Contracts

shall have the opportunity to lodge any objections to the proposed assumption and assignment to

the Successful Bidder and, if applicable, the proposed Cure Cost.

46.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an

executory contract or unexpired lease of nonresidential real property if "adequate assurance of

future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).

The meaning of "adequate assurance of future performance" depends on the facts and

circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle

Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

(citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean absolute assurance that debtor will thrive

and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably

short of an absolute guarantee of performance").  Among other things, adequate assurance may be

given by demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y.

1986) (adequate assurance of future performance is present when prospective assignee of lease has

financial resources and expressed willingness to devote sufficient funding to business to give it

strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is

whether rent will be paid).

47.     At the Sale Hearing, to the extent necessary, the Debtor will be prepared to proffer

testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under

the Assumed Contracts.  The Sale Hearing, therefore, will provide the Court and other interested

parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate

assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.

Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption

and assignment of the Assumed Contracts be approved.

48.    To facilitate the assumption and assignment of the Assumed Contracts, the Debtor

further requests the Court find all anti-assignment provisions of the Assumed Contracts to be

unenforceable under section 365(f) of the Bankruptcy Code.[1]

## REDUCTION OR ELIMINATION OF 14-DAY STAY

49.    Time is of the essence in approving and closing the sale, and any unnecessary

delay in closing the sale could result in the collapse of the sale.  Accordingly, this Court should

waive the 14-day period staying any order to sell or assign property of the estate imposed by

Bankruptcy Rules 6004(h) and 6006(d).

## CONCLUSION

50.    Based upon the authorities and facts detailed above, the Debtor requests the Court

approve the Bidding Procedures and at a Sale Hearing to be held promptly after the Auction, or if

no Auction is held, within seven (7) days after the Preliminary Bidding Deadline, subject to the

terms of the Bidding Procedures, the Court should approve the sale of the Assets to the purchaser

or such other successful bidder at the Auction. Such relief is warranted because Debtor has

---

[1] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).   Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

shown and will further establish by testimonial and documentary evidence at the hearing, that the

sale of the Assets is in the best interests of Debtor, its estate and creditors, and because the

decision to sell the Assets was reached in the exercise of the Debtor's sound business judgment,

after careful deliberation of its consequences and possible alternatives.

**WHEREFORE,** the Debtor respectfully requests the Court hear this Motion and

(I)      enter the Bidding Procedures Order:

    a.  including a finding that due and adequate notice and an opportunity to be heard in accordance with all applicable law were given to all creditors and interested parties in the chapter 11 case, and any and all other affected or interested parties;

    b.  approving the Bidding Procedures;

    c.  Approving the Break-Up Fee in the event of a Stalking Horse Bidder;

    d.  Authorizing and approving the Assumption and Assignment Procedures; and

    e.  Setting a Sale Hearing, subject to the Bidding Procedures;

and

(II)     enter the Sale Order:

    a.  authorizing the sale of the Assets free and clear of all liens, encumbrances, claims and interests, including but not limited to personal property liens, mechanics' liens, judgment liens, rights of first refusal and all other claims;

    b.  finding that the sale be effective immediately and that the stay provisions of Bankruptcy Rules 6004(h) and 6006(d) do not apply; and

    c.  providing such other relief as is just and proper under the circumstances.

Date:  October 1, 2021                          Respectfully submitted,

                                         */s/ Krystal R. Mikkilineni*
                                         Jeffrey D. Goetz, Esq., AT0002832
                                         Krystal R. Mikkilineni, Esq., AT0011814
                                         Bradshaw Fowler Proctor & Fairgrave, P.C.
                                         801 Grand Avenue, Suite 3700

Des Moines, IA 50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com

General Reorganization Counsel for
Cycle Force Group, LLC,
Debtor and Debtor-in-Possession.


## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

/s/     *Krystal Mikkilineni*

**EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No. 21-00571-als11 |
| | ) | |
| **CYCLE FORCE GROUP, LLC.** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Honorable Anita L. Shodeen |
| | ) | |
| 2105 SE 5th St. | ) | **ORDER (A) APPROVING THE** |
| Ames, IA  50020 | ) | **BIDDING PROCEDURES IN** |
| | ) | **CONNECTION WITH THE AUCTION** |
| | ) | **AND SALE OF ASSETS AND** |
| EIN:  36-3198501 | ) | **SCHEDULING AN AUCTION AND** |
| | ) | **SALE HEARING; (B) APPROVING** |
| | ) | **ASSUMPTION AND ASSIGNMENT** |
| | ) | **PROCEDURES; (C) APPROVING** |
| | ) | **THE BREAK-UP FEE; AND (D)** |
| | ) | **GRANTING OTHER RELATED** |
| | ) | **RELIEF** |
| | ) | |
| _____ | ) | Entered on Docket: _____ |

THIS MATTER having come before the Court[1] on the motion (the "<u>Motion</u>") [Docket No. ____] dated _____, of the Debtor for entry of an order (this "<u>Order</u>") approving, among other things: (a) the Bidding Procedures (substantially in the form attached hereto as **Exhibit 1**) and scheduling an Auction and the Sale Hearing for the sale of substantially all the Debtor's assets; (b) the Assumption and Assignment Procedures; and (c) the Break-Up Fee in the event of a Stalking Horse Bidder.  After due deliberation, and having reviewed the Motion, any objections thereto, and materials submitted by the parties, and having considered the statements of counsel on the record, and the evidence adduced with respect to the Motion at a hearing to consider same, and having considered the agreements announced by the parties, and

---

[1] Unless otherwise stated, capitalized terms not defined herein shall have the meanings set forth in the Bidding Procedures or the Motion.

having determined that the relief requested in the Motion is in the best interests of the Debtor and its estate, in light of the circumstances described by counsel and reflected in the evidence,

**THE COURT HEREBY FINDS:**[2]

A.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested herein are sections 105(a), 363(b) and (f), and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9006, 9007, and 9014.

C.    Notice of the Motion having been given to the Notice Parties (as defined below) is sufficient in light of the circumstances and the nature of the relief requested in the Motion.

D.    The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the sale process, which is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtor's estate, including, without limitation: (i) approval of the Bidding Procedures; (ii) approval of the Assumption and Assignment Procedures; and (iii) approval of the Break-Up Fee in the event of a Stalking Horse Bidder.

E.    The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Acquired Assets.  Accordingly, the Bidding Procedures are reasonable

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate.

F.      In the event of a Stalking Horse Bidder, the Break-up Fee (including Termination Expenses) is reasonable and appropriate given, among other things, the size and nature of the Sale and the efforts that will be expended by a proposed purchaser, and is a material inducement for, and a condition of, a proposed purchaser's entry into an APA.  The Break-up Fee constitutes actual and necessary costs and expenses of preserving the Debtor's estate. In addition, because the Stalking Horse Bidder APA, if any, will create a floor for any additional bids, the Stalking Horse Bidder will have provided significant value to the Debtor's estate.

G.      Except for the Stalking Horse Bidder (if any) no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or post-petition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Stalking Horse Bidder, if any) shall be deemed to waive any right with respect thereto.

H.      The Assumption and Assignment Procedures, including notice of proposed Cure Costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Assumed Contracts to raise any objections to the proposed assumption and assignment or to the Cure Costs.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Bidding Procedures are hereby approved in their entirety.  The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled (and all reservations of rights included therein) as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled on the merits except as otherwise set forth herein.

4.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Acquired Assets.

5.      The proposed Break-Up Fee, in the event there is a Stalking Horse Bidder, is reasonable and appropriate under the circumstances and is approved in its entirety.

6.      The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply with the Bankruptcy Code, and are approved in their entirety.

7.      All Cure Objections must: (i) be in writing; (ii) comply with the Bankruptcy Rules; (iii) state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with this Court and served on the Debtor.

8.      If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such other date as the Court may determine.

9.      Within two (2) business days of entry of this Order, the Debtor (or its agent) shall serve by first class mail, postage prepaid, copies of: (i) this Order and (ii) the Bidding Procedures upon the following entities (collectively, the "Notice Parties"):[3]

     (a)     the United States Trustee;

     (b)     counsel to the Committee;

     (c)     counsel to Great Western Bank;

     (d)     the Internal Revenue Service and the Iowa Department of Revenue;

     (e)     the United States Department of Justice;

     (f)     state, county, and municipal governments having jurisdiction over any of the Acquired Assets;

     (g)     all parties that have requested special notice pursuant to Bankruptcy Rule 2002;

     (h)     all persons or entities known to the Debtor that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets;

     (i)     all Assumed Contract parties;

     (j)     all potential bidders previously identified by or otherwise known to the Debtor; and

     (k)     all of the Debtor's employees.

10.      As further described in the Bidding Procedures, the Sale Hearing will commence on _____ at _____ **prevailing Central time** or at such other hour on that date

---

[3] The Bidding Procedures will direct parties to contact Ravinia Capital, LLC ("Ravinia") Investment Banker for the Debtor, for more information and will provide that any party that wishes to obtain a copy of any related document (subject to any necessary confidentiality agreement) may make such a request in writing to Ravinia, attention Tom Goldblatt, 125 South Wacker Drive, Chicago, IL 60606, tgoldblatt@raviniacapitalllc.com.

as the Court shall announce.  The Sale Hearing may be adjourned by the Bankruptcy Court from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

11.     Objections, if any, to the remainder of the relief requested in the Motion must: (a) be in writing and filed with this court **no later than _____ at _____ prevailing Central time** (the "Objection Deadline"); (b) comply with the Federal Rules of Bankruptcy Procedure; and (c) be served upon the Debtor, counsel for the Committee, and counsel for Great Western Bank so as to be **actually received** on or before the Objection Deadline.

12.     The Auction to conduct bidding with respect to the sale of the Acquired Assets, if necessary, shall have commenced by no later than December 15, 2021 at 10 a.m. (Central Time).

13.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgment in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

14.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

15.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

16.     The Debtor is authorized and empowered to take all actions necessary to implement the relief granted herein.

17.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.

18.     This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of this Order.

IT IS SO ORDERED.

_____

United States Bankruptcy Judge

Submitted by:


Respectfully submitted,

/s/ *Krystal R. Mikkilineni*
Jeffrey D. Goetz, Esq., AT0002832
Krystal R. Mikkilineni, Esq., AT0011814
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com

*General Reorganization Counsel for*
*Cycle Force Group, LLC,*
*Debtor and Debtor-in-Possession.*

## **EXHIBIT 1**

**BIDDING PROCEDURES**

## CFG BIDDING PROCEDURES

On April 22, 2021, Cycle Force Group ("CFG" or the "Debtor"), as Debtor and debtor in possession, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

The Debtor is seeking to sell all or substantially all of its assets for the highest or best offer. On [___], 2021, the Bankruptcy Court entered an order [Docket No. [__]] (the "Bidding Procedures Order"), which, among other things, authorized the Debtor to solicit bids and approved these bidding procedures (the "Bidding Procedures") for the consideration of the highest or otherwise best price for all or substantially all of the Debtor's assets, on the terms and conditions set forth herein.

These Bidding Procedures describe, among other things: (i) the procedures for bidders to submit bids for substantially all of the assets of the Debtor (the "Acquired Assets"); (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Acquired Assets; and (v) the ultimate selection of the Accepted Bid (as defined below).

At the time of filing the Sale Motion, the Debtor had not secured a stalking horse bidder (the "Stalking Horse Bidder"). There may, however, be a Stalking Horse Bidder prior to the Auction, in which case, the Bid submitted by the Stalking Horse Bidder (the "Stalking Horse Bid") will be subject to higher or better offers submitted in accordance with these Bidding Procedures.

## Access to Diligence Materials

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtor an executed confidentiality agreement ("Confidentiality Agreement") in form and substance reasonably satisfactory to the Debtor, as determined by the Debtor in consultation with its professionals.

The Diligence Materials shall be made available to interested bidders in a "Data Room" created and administered by the Debtor's investment banker, Ravinia Capital, LLC ("Ravinia" or the "Investment Banker"). Parties interested in receiving access to the Data Room and Diligence Materials may contact Tom Goldblatt, tgoldblatt@raviniacapitallllc.com, (312)-316-4641, and will be provided with a form of the Confidentiality Agreement.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Bidder". The Debtor will afford any Preliminary Bidder the time and opportunity to conduct reasonable due diligence under the time constraints provided herein; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Preliminary Bid Deadline. The Debtor reserves the right to withhold any Diligence Materials that it, in consultation with its professionals and the Consultation Parties (as defined below), determines are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Bidder.

Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Bidder.

Each Preliminary Bidder shall comply with all reasonable requests made by the Debtor and its advisors regarding such Preliminary Bidder.

The Debtor shall keep the Consultation Parties (as defined below) reasonably informed of all interested parties that become Preliminary Bidders and the status of their due diligence at all times.

## Assets to Be Sold

The Debtor is offering for sale all of the Acquired Assets as set forth in the form asset purchase agreement to be provided to each Preliminary Bidder (the "Form APA").  The Debtor has no obligation to sell the Acquired Assets in lots, but can, in consultation with the Consultation Parties, consider offers for the Acquired Assets in lots.

Except as otherwise provided for in these Bidding Procedures, and in the asset purchase agreement submitted by a Preliminary Bidder setting forth its Preliminary Bid (a "Bid APA"), all of the Debtor's right, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Encumbrances") to the maximum extent permitted by the order approving the sale (the "Sale Order") and the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Acquired Assets under the terms and provisions of the Sale Order.

## Bidding Process

The term "Consultation Parties" shall mean (i) the Official Committee of Unsecured Creditors (the "Committee"), and (ii) Great Western Bank.

The Debtor and its advisors, in consultation with the Consultation Parties, shall (i) determine whether any person is a Qualified Bidder as set forth herein; (ii) coordinate the efforts of Preliminary Bidders in conducting their due diligence investigations; (iii) receive offers from Preliminary Bidders, (iv) in consultation with the Consultation Parties, negotiate any offers made to purchase the Acquired Assets; (v) in consultation with the Consultation Parties, conduct an Auction of the Acquired Assets; (vi) in consultation with the Consultation Parties, select the Accepted Bid and a Backup Bid (if any); (vii) seek approval by the Bankruptcy Court of the Accepted Bid and Backup Bid (if any) at the hearing (the "Sale Hearing") set for approval of a sale or sales of the Debtor's assets (collectively, a "Sale Transaction"); and (viii) consummate the Sale Transaction at a closing (the "Closing") thereon as set forth herein and in the asset purchase agreement governing the Accepted Bid (the "Accepted Bid APA").

2

## Key Dates For Potential Preliminary Bidders

**Preliminary Bid Deadline:**                          **November 30, 2021**

**Qualified Bid Announcement Deadline:**               **December 10, 2021**

**Auction:**                                           **December 15, 2021**

**Sale Hearing:**                                      **December ___, 2021**

Preliminary Bids shall include an offer price for the Acquired Assets (including non-cash or other value) as required herein.  Each Preliminary Bidder must provide to the Debtor, by the Preliminary Bid Deadline: (1) a redline of their Bid APA to the Form APA, or in the case of a Stalking Horse Bidder, a redline to the Stalking Horse Bidder's asset purchase agreement (the "Stalking Horse APA"); (2) a clean, signed Bid APA; (3) their Bid Deposit; and (4) acceptable Proof of Performance as set forth herein.

The Debtor in consultation with its advisors, and the Consultation Parties, will evaluate the Preliminary Bids and Proof of Performance to determine Preliminary Bidders who may be Qualified Bidders at the Auction.

The Debtor may enter into verbal discussions with any or all of the Preliminary Bidders to determine clarifications of the Preliminary Bids and submitted Bid APAs and to negotiate terms of sale.  The Debtor may offer pricing guidance to the Preliminary Bidders if it determines that such guidance will provide the best value to the Debtor's estate (the "Estate").  Such pricing guidance and other discussions, if undertaken, are totally at the discretion of the Debtor and shall not be binding on the Debtor or its Estate.

The Debtor shall accept Preliminary Bids until **November 30, 2021 at 5 p.m. (Central Time)**, which shall be the "Preliminary Bid Deadline".  Any party that does not submit a Bid by the Preliminary Bid Deadline may not (i) submit any offer after the Preliminary Bid Deadline or (ii) participate in the Auction.  The Debtor shall promptly inform the Consultation Parties and the Stalking Horse Bidder (if any) of all Bids received prior to the Preliminary Bid Deadline and shall provide copies of all such Bids to counsel to each of the Consultation Parties.

Thereafter, the Debtor shall evaluate and select by **December 10, 2021 at 5 p.m. (Central Time)** (the "Qualified Bid Announcement Deadline"), those Preliminary Bids which, in its discretion, after consultation with its professionals and the Consultation Parties, are deemed qualified bids entitled to bid at the Auction (the "Qualified Bids").

After determining the highest and best Qualified Bid submitted by the Preliminary Bid Deadline (the "Baseline Bid"), and announcing the Baseline Bid as set forth herein, the Debtor shall conduct a live virtual Auction for the sale of the Debtor's assets on **December 15, 2021 at 10:00 a.m. (Central Time)** (the "Auction Date").

Prior to ending the Auction, the Debtor shall determine, after consultation with its advisors and professionals, and the Consultation Parties, the winning Bid (the "Accepted Bid") and the backup Bid (the "Backup Bid").  The Debtor shall seek Bankruptcy Court approval of

the Accepted Bid and Backup Bid (if any) at the Sale Hearing scheduled for **December __, 2021**.

### Bid Submission Process

A bid is a signed document from a Preliminary Bidder received by the Preliminary Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Preliminary Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and any other party that will be participating in connection with the bid or the Sale Transaction, and includes, at a minimum, the following (a "<u>Bid</u>"). To be eligible to be considered by the Debtor as a Qualified Bidder, each Preliminary Bidder must satisfy, to the satisfaction of the Debtor, the following conditions:

(a) <u>Good Faith Deposit</u>: Each Preliminary Bidder must submit to the Debtor, by the Preliminary Bid Deadline, a good faith deposit (a "<u>Bid Deposit</u>") equal to $5,000.00, which Bid Deposit shall be held by the Debtor in an escrow account (without interest) to be maintained by the Debtor until it determines whether or not such Preliminary Bid is a Qualified Bid. The Bid Deposit shall be refunded, or applied to the Purchase Price, as set forth herein. Any party that has not submitted its Bid Deposit may not be a Qualified Bidder, may not attend the Auction, and the Debtor may not negotiate the terms of a Bid with such party.

(b) <u>Redline APA</u>: Each Preliminary Bid must be submitted with a redline of the Form APA or the Stalking Horse APA, if applicable, (the "<u>Redline APA</u>") setting forth all proposed revisions by the Preliminary Bidder to the terms of the Form APA or Stalking Horse APA, if applicable.

(c) <u>Signed Bid APA</u>: Each Preliminary Bid must be submitted with a clean version of the Bid APA, incorporating any proposed revisions, and signed by an authorized representative of the Preliminary Bidder.

(d) <u>Same or Better Terms</u>: A statement that the applicable Preliminary Bidder offers to purchase the Acquired Assets, pursuant to a Sale Transaction that is no less favorable to the Estate, as the Debtor may reasonably determine, in consultation with the Consultation Parties, than the Sale Transaction contemplated in the Stalking Horse APA, if applicable.

(e) <u>Backup Bidder</u>: Each Bid submitted must provide that the (i) Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (a) the Closing of the Sale Transaction on the Accepted Bid; or (b) thirty (30) days after the Sale Hearing, and the (ii) Qualified Bidder is obligated to perform as a Backup Bidder (as defined below) in the event such Qualified Bidder is not the Successful Bidder.

(f) <u>Purchase Price; Minimum Bid</u>: Each Bid submitted must exceed the Minimum Overbid Amount (as defined below).

4

(g) <u>Designation of Assigned Contracts and Leases</u>:  A Preliminary Bid must identify with particularity each and every executory contract and lease with respect to which the Preliminary Bidder seeks assignment from the Debtor.

(h) <u>Excluded Assets</u>: A Preliminary Bid must identify with particularity each of the Acquired Assets which the Preliminary Bidder does not wish to include in its offer.

(i) <u>Corporate Authority</u>: A Preliminary Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization of the Preliminary Bidder to consummate the proposed Sale Transaction; <u>provided</u> <u>that</u>, if the Preliminary Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Preliminary Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the Sale Transaction by the equity holder(s) of such Preliminary Bidder.

(j) <u>Disclosure of Identity of Preliminary Bidder</u>:  A Preliminary Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders, in the case of a Preliminary Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Preliminary Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Preliminary Bid.  A Preliminary Bid must also fully disclose any connections or agreements with the Debtor, or any other known, potential or prospective Preliminary Bidder, and/or any officer, director or equity holder of the Debtor.

(k) <u>Proof of Financial Ability to Perform</u>:  A Preliminary Bid must include written evidence that the Debtor may conclude, in consultation with its advisors, and the Consultation Parties, demonstrates that the Preliminary Bidder has the necessary financial ability to close the Sale Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts and/or leases to be assumed and assigned in such Sale Transaction (collectively, such written evidence, the "<u>Proof of Performance</u>").

(l) <u>Contact Information and Affiliates</u>:  The Preliminary Bid must provide the identity and contact information for the Preliminary Bidder and full disclosure of any affiliates of the Preliminary Bidder.

(m) <u>Contingencies</u>:  Each Preliminary Bid **<u>shall not</u>** be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence.

(n) <u>Due Diligence</u>:  Each Preliminary Bid, which the Debtor deems a Qualified Bid, must expressly acknowledge and represent that the Qualified Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets

5

and the proposed transaction prior to making its Bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Acquired Assets in making its Bid or that of any of its legal, financial or other advisors, and (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Acquired Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the asset purchase agreement ultimately accepted and executed by the Debtor.

(o)     Irrevocable:  Each Preliminary Bid, which the Debtor deems a Qualified Bid, must be irrevocable in accordance with the Bidding Procedures until five (5) business days after the Sale Hearing, provided that if such Preliminary Bid is determined by the Debtor to be the Accepted Bid or the Backup Bid, such Preliminary Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

(p)     Compliance with Diligence Requests:  A Preliminary Bidder must have complied with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction.

(q)     Covenant to Cooperate: Each Preliminary Bid must include a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Preliminary Bidder's operations reasonably required to analyze issues arising with respect to any applicable anti-trust laws and other applicable regulatory requirements.

(r)     Confidentiality Agreement:  To the extent not already executed, the Preliminary Bid must include an executed Confidentiality Agreement in form and substance reasonably satisfactory to the Debtor.

(s)     Environmental Requirements: Nothing in these Bidding Procedures releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of an order approving these Bidding Procedures. Nothing in these Bidding Procedures authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law. Nothing in these Bidding Procedures divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret these Bidding Procedures, or to adjudicate any defense asserted under the order approving these Bidding Procedures.

A Preliminary Bid must contain an acknowledgment of the statement above.

6

(t)    <u>Closing Date</u>:  A Preliminary Bid must include a commitment to close and fully consummate the transactions contemplated by the Bid APA by **December 30, 2021**.

(u)    <u>Bid Deadline</u>:  The following parties must receive a Preliminary Bid in writing (in both PDF and Word format), on or before the Preliminary Bid Deadline: (i) the Debtor's Investment Banker, attention Tom Goldblatt (tgoldblatt@raviniacapitallc.com); (ii) general reorganization counsel to the Debtor, attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradshawlaw.com); (iii) counsel to the Committee, attention A.J. Webb (awebb@fbtlaw.com) and Robert Gainer (rgainer@cutlerfirm.com); and (iv) counsel to Great Western Bank, attention Jeff Courter (jwc@nyemaster.com).

A Preliminary Bid received from a Preliminary Bidder, on or before the Preliminary Bid Deadline, that meets the above requirements, shall constitute a "<u>Qualified Bid</u>", and such Preliminary Bidder shall constitute a "<u>Qualified Bidder</u>"; <u>provided</u> that if the Debtor receives a Preliminary Bid prior to the Bid Deadline that is not determined by the Debtor, in accordance with these Bidding Procedures and in consultation with the Consultation Parties, to constitute a Qualified Bid, the Debtor may provide the Preliminary Bidder with the opportunity to remedy any deficiencies prior to the Preliminary Bid Deadline (or, as it deems appropriate, after the Preliminary Bid Deadline); <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtor to its satisfaction, the Debtor may, after consulting with its professionals and the Consultation Parties, disqualify any Qualified Bidder and reject a Qualified Bid.

If one or more Qualified Bids are received by the Preliminary Bid Deadline, the Debtor will notify such Qualified Bidders that they shall be entitled to attend and bid at the Auction. The Debtor will determine prior to the Auction the Qualified Bid selected as the Baseline Bid. This determination shall take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bids received by the Estate and may include, but are not limited to, the following:  (a) the Acquired Assets to be purchased, the amount and type(s) of the consideration, and the resulting recovery to holders of claims; (b) the number, type and nature of any changes to the Bid APA requested by such Qualified Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to the Estate of such modifications or delay, and the extent to which a Qualified Bidder has mitigated such risk in its Qualified Bid; (d) the total consideration and value thereof to be received by the Estate; (e) the Qualified Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the Estate; and (g) the risk to the Debtor's Estate of selecting such Qualified Bid over another Qualified Bid (collectively, the "<u>Bid Assessment Criteria</u>").

If there is a Stalking Horse Bid and no other Qualified Bids are received by the Qualified Bid Deadline, the Stalking Horse Bid shall be deemed the Accepted Bid and no Auction shall be conducted.

## Determination and Announcement of Baseline Bids

In evaluating the Bids, the Debtor, in consultation with the Consultation Parties, shall also make a determination regarding which Qualified Bid is the highest or best Qualified Bid for the Acquired Assets and such Baseline Bid will therefore serve as the starting point at the Auction.   On or before **December 14, 2021 at 5 p.m. (Central Time)** (the "Designation Deadline"), the Debtor shall file a notice designating the Baseline Bid and publish such notice in the Data Room and/or distribute the same at the Auction.  The Debtor shall also provide copies of such Baseline Bid to all of the Qualified Bidders, including the Stalking Horse Bidder, if any, and to each of the Consultation Parties.

## Conduct of the Auction and Bidding Terms and Conditions

If the Debtor receives one or more Qualified Bids, the Debtor will conduct the virtual Auction on December 15, 2021, **beginning at 10:00 a.m. (Central Time)**.  Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtor may impose in good faith as set forth herein.  In addition, professionals and/or other representatives of (i) the Debtor, (ii) the Committee; and (iii) Great Western Bank will be permitted to attend and observe the Auction.

At the Auction, Qualified Bidders will be permitted to increase their bids in successive rounds of bidding.  Bidding will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in minimum increments of at least $100,000 (a "Minimum Overbid Amount") and all subsequent overbids shall be by $100,000.  For the avoidance of doubt, in the event there is a Stalking Horse Bidder, the initial Minimum Overbid Amount shall be $200,000.00. The Debtor reserves the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction. The Debtor, in consultation with its advisors and the Consultation Parties, shall determine, in its sole discretion, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

For the avoidance of doubt, the Stalking Horse Bidder, if any, shall be permitted to include the full amount of the Break-Up Fee in each bid by the Stalking Horse Bidder for the purposes of comparison to any overbid in connection with each round of bidding in the Auction.

The Debtor may adopt rules for the Auction at any time that the Debtor, in consultation with the Consultation Parties, reasonably determines to be appropriate to promote a spirited and robust auction, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.  At the start of the Auction, the Debtor shall describe the terms of the Baseline Bid. Each Qualified Bidder will be permitted what the Debtor, in consultation with the Consultation Parties, reasonably determines to be an appropriate amount of time to respond to the previous Bid at the Auction.  The Auction will be conducted openly and shall be transcribed or recorded, and the Qualifying Bidders will be informed of the material terms of the previous bid.

In evaluating a Qualified Bid submitted at the Auction, the Debtor may consider, among

8

other things and without limitation, the amount of cash to be paid or delivered, the speed and certainty of consummating a transaction, and any other relevant factor.  Prior to the conclusion of the Auction, the Debtor, after consultation with the Consultation Parties, shall announce on the record that it has determined in its business judgment that it has received the highest or otherwise best Qualified Bid in the Accepted Bid, and the Qualified Bidder that had submitted such Qualified Bid shall be declared the winning bidder (the "Successful Bidder").  The Debtor, after consultation with the Consultation Parties, shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid as a Backup Bid and shall be declared the backup bidder (the "Backup Bidder").

The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until the earlier of (i) the Closing of the Sale Transaction on the Accepted Bid; or (ii) thirty (30) days after the Sale Hearing.  Promptly following the Debtor's selection of the Accepted Bid, it shall file with the Bankruptcy Court notice of the Accepted Bid and Backup Bid, if any (the "Auction Report"), accompanied by such Successful Bidder's and Backup Bidder's Bid APA.

Following the Sale Hearing, if the Successful Bidder fails to consummate its purchase of the Acquired Assets by the Sale Closing date, the Debtor may deem the Backup Bidder to have the new prevailing bid, and the Debtor will be authorized, without further order of the Bankruptcy Court, to consummate the Sale Transaction with the Backup Bidder.  In such case of a failure to consummate the purchase of the Acquired Assets on the part of the Successful Bidder, the defaulting Successful Bidder's Bid Deposit shall be forfeited to the Debtor for the benefit of the Estate.  In addition, the Debtor, on behalf of the Estate, specifically reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as the new Successful Bidder).

Each Preliminary Bidder, by submitting its Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Debtor and its agents and representatives (other than as may be set forth in a definitive agreement executed by the Debtor), regarding the Debtor, the Acquired Assets, these Bidding Procedures or any information provided in connection therewith.

## Sale Is As Is/Where Is

The sale of the Acquired Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or the Estate.  By submitting a bid, each Preliminary and Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in these Bidding Procedures.

9

## Sale Hearing

The Accepted Bid and the Backup Bid will be subject to approval by the Bankruptcy Court at the Sale Hearing on the date set forth above, or such other date as the Court may set. The Sale Hearing may be adjourned by the Debtor from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtor's chapter 11 case.

## Return of Deposits

The Bid Deposits of all Preliminary Bidders whose Preliminary Bid is not deemed by the Debtor as a Qualified Bid shall be returned to such Preliminary Bidder, without interest, within three (3) business days of such determination. The Bid Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Bid Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder within three (3) business days after the Closing of the Sale Transaction with the Successful Bidder. If the Successful Bidder timely and fully closes the Sale Transaction, its Bid Deposit shall be credited towards the Purchase Price.

## Closing of the Sale Transaction

The Successful Bidder shall fully consummate the Sale Transaction at a Closing to be scheduled and conducted by the Debtor and its professionals by no later than **December 30, 2021.** No later than the Sale Closing date, the Successful Bidder shall be required to pay to the Debtor the balance of the Purchase Price in immediately available funds as set forth in the Successful Bidder's asset purchase agreement; execute such documents as the Debtor deems reasonably necessary to consummate the Sale Transaction; and otherwise fully consummate the Sale Transaction in accordance with the terms of the Accepted Bid APA as approved by the Bankruptcy Court. The Debtor may elect to conduct and consummate the Closing electronically and shall not be required to close the Sale Transaction in person if it deems it advisable.

## Modifications

The Debtor, in its sole discretion, but in consultation with its advisors and the Consultation Parties, may adopt, implement, and/or waive such other, additional or existing procedures or requirements that serves to further an orderly Auction and bidding process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend at an Auction or participate in the Auction, as appropriate.

The Debtor, in its sole discretion, but in consultation with its advisors and Consultation Parties, may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of an order approving the Accepted Bid, any Bid that, in the discretion of the Debtor, in consultation with its advisors and the Consultation Parties is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtor's estate and its creditors. At or before the conclusion of the Auction, the Debtor, in its sole discretion, but in consultation with

its advisors and Consultation Parties, may impose such other terms and conditions upon Qualified Bidders as the Debtor determines to be in the best interests of the Debtor's estate.

## Consultation Parties

The Debtor shall use its best efforts to consult and confer with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtor's discretion in any way and shall not include the right to veto any decision made by the Debtor in the exercise of its business judgment. Nothing in these Bidding Procedures shall limit, impair, or otherwise prejudice the ability of the Consultation Parties to object in connection with the Sale contemplated by these Bidding Procedures.

The Debtor may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; provided, however, that the Debtor may, in the exercise of its business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

## Reservation of Rights of the Debtor

Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Debtor, in consultation with the Consultation Parties, further reserves the right as it may reasonably determine to be in the best interest of its Estate and consistent with its fiduciary duties, to: (a) determine which Preliminary Bidders are Qualified Bidders; (b) determine which Preliminary Bids are Qualified Bids; (c) determine which Qualified Bid is the Accepted Bid or Backup Bid; (d) reject any Preliminary Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (3) contrary to the best interests of the Debtor and its Estate; (e) waive non-compliance with any of the terms and conditions set forth herein as the Debtor determines to be in the best interests of the Estate, its creditors, and other parties in interest; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Sale Hearing in open court, or by filing a notice on the docket of the Debtor's chapter 11 case, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtor determines, in its business judgment, will better promote the goals of the bidding process and discharge its duties; provided, however, that any modification or additions to the Bidding Procedures shall not be materially inconsistent with the Bidding Procedures Order, Sale Order, or any other order of the Court.

## Break-Up Fee and Expense Reimbursement

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder, if any, is entitled to the Break-Up Fee (including Termination Expenses) in accordance with the terms of the Stalking Horse APA, the Sale Motion, and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Bidder, if any, no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or post-petition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Stalking Horse Bidder, if any) shall be deemed to waive any right with respect thereto.

### Consent to Jurisdiction and Authority as Condition to Bidding

All bidders that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.